# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| STANLEY J. SEGAL | : |
|       DEBTOR(S) | : BANKRUPTCY NO.  10-16822 SR |

| | |
|---|---|
| ROBERT H. HOLBER, TRUSTEE | : |
| | : |
|       PLAINTIFF(S) | : |
| VS. | : |
| STANLEY J. SEGAL | : |
| PAUL D. SEGAL, | : |
| CAPITAL FAMILY PARTNERS, LLC., | : |
| GREEN LION GROUP, LLC, | : |
| ELIEZER FIREDMAN, | : |
| NAFTALI WEINBERER, | : |
| 50 JERSEY LLC, | : |
| NAOMI WEINBERGER, | : |
| YEHOSHUA FRIEDMAN | : |
| SF FAMILY CREDIT SHELTER TRUST, | : |
| OAKHURST PROPERTIES, LLC, | : |
| OAKWOOD HEALTHCARE, LLC, | : |
| ARDSLEY GROUP, INC., | : |
| ASHTON HALL, INC., | : |
| ASHTON TERRACE, INC. | : |
|       DEFENDANT(S) | : ADVS NO.  13-572 |

# OPINION

BY:  STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

Before the Court are two Motions wherein the Movants seek dismissal of those counts in the above adversary proceeding which are directed at them. One dismissal motion has been filed by 10 of the 15 defendants who refer to themselves collectively as the "Capital Family Defendants." The other is brought by the remaining 5 defendants,

who refer to themselves collectively as the "Segal Defendants."[1]  The Plaintiff is the

Chapter 7 Trustee, Robert H. Holber. An "omnibus" response in opposition to both

motions was filed on behalf of the Trustee and a hearing was held on March 19, 2014.

For the reasons which follow, both motions will be granted and the Complaint

dismissed.


*Background*

A rather detailed review of the history of this case is required in order to place the

matters before the Court in their proper light.

The Debtor, Stanley Segal, commenced this Chapter 7 Bankruptcy case on

August 13, 2010. The case was filed on his behalf by attorney Robert Chernicoff, of the

firm Cunningham & Chernicoff, P.C. Robert Holber was appointed Chapter 7 Trustee.

The precipitating event for the bankruptcy filing was a $1,829,369 judgment entered

against Segal in the Philadelphia Court of Common Pleas on July 27, 2010. The

judgment arose from litigation wherein the Plaintiff, Reliant Healthcare Management,

Inc. ("Reliant") claimed that Segal and others had conspired to tortuously interfere with

Reliant's contract to manage a pair of nursing home facilities owned by an entity

controlled by Segal. Reliant was represented in State Court by Attorney Mark L.

Rhoades of the law firm Mitts Milavec,LLC. Segal was represented by attorney

Christopher J. Fox, of the law firm Richman Berenbaum & Associates, P.C.

---

[1] The Capital Family Defendants are: Capital Family Partners, LLC, Green Lion Group, LLC, Eliezer
Friedman, Naftali Weinberger, 50 Jersey LLC, Naomi Weinberger, Yehousua Friedman, SF Family Credit
Shelter Trust, Oakhurst Properties, LLC, and Oakwood Healthcare, LLC d/b/a Oakwood Healthcare and
Rehabilitation Center, Inc. and Rehabilitation Center. The Segal Defendants are: Stanley Segal, Paul
Segal, Ardsley Group, Inc., Ashton Hall, Inc., and Ashton Terrace, Inc.

The State Court litigation was commenced in January 2008. At about that time Segal was negotiating a sale of the two nursing home facilities to two of the Capital Family Defendants (i.e., Capital Family Partners, LLC and Green Lion Group, LLC). The sale was consummated on April 27, 2008. Among the consequences of the sale was what was later determined in State Court to be the improper termination of Reliant's contract to manage the nursing homes. Reliant's judgment makes it the Debtor's largest unsecured creditor.

Two days prior to closing on the sale of the nursing homes the Buyers had entered into a consulting agreement with Segal. (the "Consulting Agreement') Pursuant to it, Segal was to be paid $1.9 million over a period of 10 years to provide various and sundry consulting services to the Buyers, all as described in the Consulting Agreement. (See Exhibit D to the Complaint.)  Of significance herein, the Consulting Agreement at ¶ 11 provides, as follows:

> 11. No creditor of Stanley Siegel's Ashton Hall, Inc., Ashton Terrace, Inc., or Ardsley Group, Inc., (All four collectively "Debtors") shall have any right or power to sell, assign, convey, mortgage, pledge, anticipate, hypothecate, or otherwise dispose of any right, title, or interest that the creditor may acquire in the fees to be paid under this agreement until the fees have actually been paid over to Stanley Siegel. Nor shall the fees to be paid or any part of them be liable for, or to any extent subject to, any debts of any kind or nature incurred or contracted by any of the Debtors<u>. Any right of receipt by Stanley Siegel shall be suspended and may not be exercised by Stanley Siegel on the filing of a proceeding in bankruptcy by Stanley Siegel. The suspension shall be continued during bankruptcy proceedings and shall be restored only after the entry of a final order of discharge of Stanley Siegel</u>. In the event a bankruptcy court finds a part or all of this paragraph invalid or unenforceable, then, in the event a voluntary or involuntary bankruptcy is filed by or on behalf of any Selling Entities or any shareholder thereof, and a bankruptcy court enters an order against Owner to pay an additional amounts due to a finding of a preferential transfer or otherwise, Owner may set this off against any amounts due to Consultant under this Agreement upon payment of these amounts to any of Selling Entities' creditors. The terms of paragraph 10 of

3

this Agreement shall supercede those of paragraph 11. (Emphasis added.)

Two $250,000 payments were made to Segal in 2008. There is apparently a dispute as to whether one additional $250,000 payment was made, but it appears agreed that no other installment payments under the Consulting Agreement were made. Segal disclosed and described his "rights" under the Consulting Agreement on Bankruptcy Schedule B (Personal Property) at ¶ 21. (Contingent and Unliquidated Claims), as follows:

> Possible collection of monies owed under Consulting Agreement – Collection Doubtful.

He estimated the value of this asset as "unknown."  Payments under the Consulting Agreement were guaranteed by two of the Capital Family Defendants, Eliezer Friedman and Naftali Weinberger. (See: Complaint Exhibit D).

Meanwhile, Segal's Schedule "C" – Property Claimed as Exempt, contained the following relevant entry at ¶ 22:

> Possible collection of monies owed.

Segal had claimed the Federal as opposed to the State exemptions, and in that regard had claimed "any remaining equity" in the "monies owed" as exempt under 11 U.S.C. § 522(d)(5). Segal again, however, reported the value of the asset as "unknown."

A Section 341 first meeting of creditors was originally scheduled in Segal's case for September 10, 2010. The meeting of creditors was eventually held on September 28, 2010. Shortly thereafter, on October 10, 2010, Attorney Rhoades entered his appearance in the Bankruptcy case on behalf of Reliant (Docket Entry #20). At that time

4

Rhoades was still associated with the firm, Mitts Milavec, LLC. On October 28, 2010,

attorney Fox entered his appearance in the case as "an interested party." By that time

attorney Fox had become associated with the firm Lamm Rubenstone, LLC.

On October 29, 2010 Trustee Holber filed a notice changing the status of the

Segal Bankruptcy case from "no-asset" to "asset." (Docket Entry #34) the Notice  reads,

as follows:

NOTICE OF CHANGE FROM NO-ASSET TO
ASSET AND REQUEST TO THE CLERK TO
FIX BAR DATE TO FILE CLAIMS AGAINST
THE ESTATE.

TO FREDERIC J. BAKER, SENIOR ASSISTANT UNITED
STATES TRUSTEE,

Robert H. Holber, Esquire, the Trustee in the above
captioned matter, after due inquiry, having discovered assets
hereby gives Notice that this is an ASSET case. The Trustee
also requests the Clerk to fix a bar date to file claims against
the estate.

/s/ Robert H. Holber____
Robert H. Holber, Esquire
Chapter 7 Trustee

Dated:  10/29/10


A separate Notice to this effect was sent to scheduled creditors and it advised

them to file any claims against the Bankruptcy estate no later than January 31, 2011.

Concurrently with his "change" notice, Trustee Holber filed an application to employ

attorney Dexter Case as his counsel under 11 U.S.C. § 327(a). An Order approving that

request was entered on November 12, 2010.

On December 21, 2010 attorney Rhoades filed Motions on behalf of Reliant to take Bankruptcy Rule 2004 examinations of the Nursing Home Buyers: Capital Family Partners, LLC, and Green Lion Group, LLC. (Docket Entry #62 and #63)

The two motions each read the same. Of significance, they each recite in pertinent part, as follows:

¶      1. Reliant brings this Motion to protect its rights to properly investigate the assets of the Debtor, Stanley Segal ("Debtor"), and to investigate whether Debtor has fraudulently transferred assets to entities, individuals and trusts both within and without his control.  Upon information and belief, and based upon sworn testimony of the Debtor in the underlying litigation, Reliant believes that following Debtor's expected discharge from bankruptcy, Debtor will attempt to recover millions of dollars from various entities that he  is currently using to hide his assets from the Bankruptcy Court and creditors. Many of the entities and individuals from which Reliant seeks discovery were involved in the sale of the Ashton Hall nursing care facility ("Ashton Hall").

¶      2. At the closing of the Ashton Hall sale, Debtor, through his seller-entity, *paid* the buyers, Green Lion Group, LLC and Capital Family Partners, LLC, over $2,418,364.67 and paid the law firm of Richman, Berenbaum & Associates $1,151,397.35. Reliant  seeks discovery related to the propriety of these payments. Shockingly, although the purchase price paid for Ashton Hall by the buyers was $8,557,243.36, the settlement sheet from the sale indicates that the Debtor *paid* $145.17 to the buyers for the privilege of selling Ashton Hall. A copy of the settlement sheet is attached hereto as Exhibit C.

The Motions at Exhibit "B" elaborate on the "topics for the examination," as follows:

## EXHIBIT B – TOPICS FOR EXAMINATION

1. The purchase of the assets and real estate of Ashton Hall, Inc. by Green Lion Group, LLC, Oakhurst Properties, LLC and/or Capital Family Partners, LLC, as

evidenced by the Settlement Statement attached to this Motion as Exhibit C.

2. Payments made by Stanley Segal and/or Ashton Hall, Inc. to Green Lion Group, LLC.

3. Payments made by Stanley Segal and/or Ashton Hall, Inc. to Capital Family Partners, LLC.

4. Payments made by Stanley Segal and/or Ashton Hall, Inc. to Oakhurst Properties, LLC.

5. Payments made by Stanley Segal and/or Ashton Hall, Inc. to Richman Berenbaum and Associates with respect to the sale of the assets and real estate of Ashton Hall, Inc. to Green Lion Group, LLC, Oakhurst Properties, LLC and/or Capital Family Partners, LLC.

6. The assets of Debtor, Stanley Segal

On December 23, 2010 attorney Rhoades filed a third Rule 2004 Motion, this seeking an examination of Segal. It was unopposed and the Motion was granted on January 25, 2011. Answers in opposition to the 2004 Examination requests as to Capital Family Partners, LLC and Green Lion Group, LLC, had been filed and a hearing on these was held January 25, 2011. The parties thereafter reported that dispute as having been resolved consensually. The examinations were thereupon scheduled and took place. The Motions, Settlement Stipulation and Approval Orders were all served on the Trustee and his counsel, Dexter Case, Esquire.

On April 1, 2011 the Trustee filed an Objection to the exemptions claimed by the Debtor on Bankruptcy Schedule "C," (Docket Entry #105). The Trustee noted therein that 1) the Debtor had claimed the exemption of "monies owed" under 11 U.S.C. § 522 (d)(5); 2) that Section 522(d)(5) places a dollar limit on the maximum allowable exemption thereunder; 3) that the Debtor had all but exhausted the available exemption

7

under Section 522(d)(5) on other property; and 4) that the Debtor had listed the value of

the monies owed as unknown. As a consequence, the Trustee asserted that he could

not determine if the Debtor's claim of exemption in the monies allegedly owed under the

Consulting Agreement exceeded the Debtor's remaining entitlement under 11 U.S.C. §

522(d)(5). The Trustee calculated the Debtor's remaining entitlement, after deducting all

other property claimed as exempt under that section, to be $410. Accordingly the

Trustee requested that the Debtor's entitlement to "any remaining equity" in the "monies

owed" be capped at $410.

A hearing on the Trustee's Exemption Objection was held on April 28, 2011. At

that time the parties reported the matter settled. On May 3, 2011 a Stipulation and

Consent Order was approved by the Court. The parties' agreement is central to matters

before the Court. The brief stipulation reads as follows:

STIPULATION AND CONSENT ORDER OF DEBTOR AND
TRUSTEE WITH RESPECT TO TRUSTEE'S OBJECTION
TO DEBTOR'S EXEMPTIONS

This Stipulation is entered into by and between
Stanley J. Segal ("Debtor") and Robert H. Holber ("Trustee"),
by and through their respective attorneys as follows:

1    August 13, 2010, the Debtor filed a Voluntary
Petition under Chapter 7 of the United States Bankruptcy
Code.
2.  The Trustee is the duly appointed Chapter 7
Trustee.

3.  The Trustee filed an Objection to Debtor's
exemptions on or about April 1, 2011 (the "Objection").

4.  The Trustee and the Debtor have negotiated with
respect to a resolution of the Objection and the parties have
agreed to stipulate and resolve the Objection as set forth
hereinafter:

a. The Debtor will file an Amendment to Schedule C in the form attached hereto as Exhibit "A" whereby the Debtor will only receive exemptions in the items set forth in Paragraph 4 of the Objection up to the remaining amount available to the Debtor under Section 522(d)(5) of the Bankruptcy Code.

b. Notwithstanding the filing of the Amendment set forth in Paragraph 4(a) above, such filing and the entry by the Debtor into this Stipulation is without prejudice to the rights of the Debtor to claim that any amounts owed to the Debtor set forth in Debtor's Schedule B as possible collection of monies owed under the consulting agreement (the "Consulting Agreement"), may constitute wages owed to the Debtor and are exempt or are not property of the Debtor's estate.

c. In the event that the Debtor so claims as to the sum owed under the Consulting Agreement, the Trustee shall have the right to file any further pleading in the Court contesting such right of the Debtor to receive such Consulting Agreement payments.

Wherefore, Stanley J. Segal, the above named Debtor and Robert H. Holber, Trustee, respectfully request that this Honorable Court enter an Order approving the terms of this Stipulation.

The Stipulation was approved by the Court on May 3, 2011.[2]

The next event of significance occurred on September 30, 2011, with the filing by

attorney Rhoades of an adversary proceeding on behalf of Reliant requesting a

determination that Segal's judgment debt to Reliant was non-dischargeable under 11

U.S.C. § 523(a)(6) because it was based on a wilful and malicious injury. (Docket Entry

---

[2] An Amended Schedule "C" which reflected the Agreement was filed on February 24, 2012.

#124). In support Reliant attached its Complaint from the Philadelphia Common Pleas Court lawsuit and the Jury's completed verdict form.

By January 9, 2012, Segal and Reliant had ostensibly settled their differences over the dischargeability action pursuant to a written stipulation fully executed by counsel on behalf of each. The Stipulation is attached as Exhibit "A" to a Motion seeking approval of the Stipulation as a "compromise" under F.R.B.P. 9019 (Docket Entry #125). The Rule 9019 Motion was filed on January 9, 2012. It was served on Trustee Holber's counsel, Dexter Case, but recites at ¶ 22 that the Trustee "does not concur in the relief herein requested." Two days later, on January 11, 2012, attorney Chernicoff filed a Praecipe on Segal's behalf withdrawing the Rule 9019 Motion, without explanation.

Four days later, on January 16, 2012, the Trustee filed a Notice changing the Segal Bankruptcy case back from an "asset" case to a "no-asset" case. Concurrently therewith the Trustee filed a "Report of No Distribution" and asked to be discharged from any further duties. (Docket Entry #128)

Despite withdrawal of the Rule 9019 Motion, Reliant's non-dischargeability case was still reported as settled. It was accordingly closed on March 8, 2012. On June 26, 2012, an Order was entered discharging Segal. The same day an Order was entered approving the Trustee's Report of No Distribution, Discharging the Trustee and Closing the Bankruptcy Case.

Three days later, on June 29, 2012, Segal filed a Complaint in the United States District Court for the Eastern District of Pennsylvania against Eliezer Friedman and Naftali Weinberger, the two Capital Family Defendants who had guaranteed payment under the Consulting Agreement. (Civil Action 12-3663)

10

Segal's Complaint was filed by attorney Fox. It contains three counts: 1) Breach of Contract; 2) Fraud; and  3) Civil Conspiracy. Although the demand for relief is unliquidated, it appears, at a minimum, that Segal is pressing claim to amounts unpaid under the Consulting Agreement.

The Defendants moved to dismiss Segal's complaint, however, the District Court did not do so. Instead, on October 4, 2012, the Court issued an Order transferring Segal's Civil Action to the Bankruptcy Court, as follows:

ORDER

AND NOW, this 4th day of October, 2012, as a result of information contained within Doc. Nos. 5-2 and 7-1 of the docket in this case, it is hereby ORDERED that the above-captioned matter be transferred to United States Bankruptcy Court for the Eastern District of Pennsylvania, for a determination as to whether or not the subject of the contract at issue was properly reported to said court and considered by the Trustee during the pendency of Plaintiff's Chapter 7 Petition.[1]

BY THE COURT:

/s/ C. Darnell Jones, II, J.

---

[1] Docketed at 10-16822 (sr).

On January 18, 2013 Attorney Fox filed a Motion to Transfer the Civil Action back to the District Court (Docket No. 136), arguing that the Consulting Agreement had been fully considered by the Trustee and had been abandoned to Segal who now held "all rights and title to the Consulting Agreement." (Motion at ¶ 10).

Segal's Transfer Motion was opposed by Friedman and Weinberger, and also by Reliant. A hearing on the matter was held on February 6, 2013. Attorney Fox appeared on behalf of Segal, Attorney Rhoades appeared on behalf of Reliant, and Attorney

William J. Levant of the firm Kaplin, Stewart, Meloff, Reiter & Stein, P.C. appeared on

behalf of Friedman and Weinberger. Former Trustee Holber filed no papers and was not

present at the hearing, in person or through counsel.

At the hearing attorney Fox represented to the Court that he had spoken to

Holber's former counsel a few months earlier and was told that Holber took no position

and planned to take no action. (N.T. 2/6/13, at 3). Fox also argued that the funds being

claimed under the Consulting Agreement by Segal were "wages" and would not be part

of the Bankruptcy Estate in any event. (*Id.)*

Friedman and Weinberger argued that it would be premature to simply transfer

the Civil Action back to the District Court without conducting a hearing on the matters

described in the District Court's October 4, 2012 Order. Further to this point, the two

Respondents asserted that the Chapter 7 Trustee had not been made sufficiently aware

of the value of the Consulting Agreement during the bankruptcy case so as to have

properly abandoned any claims having to do with it back to the Debtor. (Response of

Friedman & Weinberger, at ¶ 6.) To the contrary, they argued, the Chapter 7 trustee

had not been provided with sufficient information to make an intelligent and knowing

decision to abandon the claims against them. (*id. a*t ¶ 8) It was necessary, they urged,

for the Court to consider the adequacy of the Debtor's disclosure of his claims against

them in order to "vindicate the bankruptcy process, the integrity of which depends in

overwhelming part upon the forthrightness of debtors in providing correct complete

information about their assets and liabilities." *(id.* at ¶ 12)

As noted, a hearing on the transfer Motion was held on February 6, 2013. At the

hearing, Reliant's attorney, Rhoades, appeared and identified himself as the one who

"presented this case" to the Trustee (N.T. 2/6/13, at 8) It would appear that Rhoades'

association with the Mitts Milavec Law Firm had by this time ended. Rhoades was now

associated with the Haviland Hughes Law Firm.

Asked whether he had ever offered to be special counsel to the Trustee,

Rhoades stated that he had had several discussions with the Trustee about that. (N.T.

2/6/13, at 8) He stated that the Trustee "would not advance the case" but had asked if

Rhoades' client "would advance the cause of the case." The client apparently said no,

and there were then discussions over whether Rhoades would take the case on a

contingency basis. Rhoades informed the Court on February 6, 2013 that he was

unable to do so at that earlier time, but that he was ready to do so now. (*Id.*)

Friedman and Weinberger's counsel, Levant, acknowledged that his clients were

going to be sued over the Consulting Agreement in any event, but that "candidly" he

would much rather deal with a Chapter 7 Trustee and counsel that Mr. Segal. (N.T.

2/6/13, at 9) The Court concluded that overall the situation did not pass what it called

"the smell test" and indicated it would reopen the case. Attorney Levant suggested the

appointment of a Chapter 7 Trustee other than Mr. Holber, while attorney Fox argued

for appointment of Mr. Holber, but against his retaining attorney Rhoades as special

counsel. Those, however, were questions for another day.

That day arrived shortly. On February 7, 2013 Holber was reappointed Chapter 7

Trustee and on February 27, 2013 attorney Dexter Case was reappointed as his

counsel. Trustee Holber withdrew his Report of No Distribution on February 18, 2013

and once again changed the status of the case from a "no-asset" case to an "asset"

case. On March 13, 2013 Attorney Case filed an Application on behalf of Holber for

authority to retain Rhoades and his new firm Haviland Hughes  as special counsel to the

Trustee for the following purpose:

> ¶ 7. The professional services that Haviland Hughes will render include providing legal services to the Trustee in connection with the transaction and circumstances that gave rise to the contract dispute between the Debtor and various parties in litigation captioned *Segal v. Friedman, et al.*, No. 2:12-cv-03663, in the United States District Court for the Eastern District of Pennsylvania, and the possible prosecution of additional claims arising from the sale of the Debtor's interest in a certain nursing home facility known as Ashton Hall, and any other actions that are yet to be identified.

In an affidavit accompanying the Application Rhoades acknowledged that he had

formerly represented Reliant in matters directly related to "the proposed litigation," but

that he no longer represented Reliant and had received a waiver from Reliant allowing

him to now represent the Trustee.

Friedman and Weinberger objected to the request to retain Rhoades, as did

Segal. Friedman and Weinberger asserted that Segal had released any claims under

the Consulting Agreement and that they had written proof thereof. Segal claims his

signature on the purported release documents is forged. Friedman and Weinberger

argued that this was a threshold issue and that the Trustee should retain a handwriting

expert to verify the authenticity of the release documents before any more litigation was

undertaken. They stated further that, irrespective of the authenticity issue, they stood

ready to discuss amicable resolution of the Estate's claims against them. Segal, as

noted, argued that the monies owed under the Consulting Agreement "constitute the

equivalent of wages," and as such were not subject to the jurisdiction of the Trustee.

Segal also argued that any claims having to do with the sale of the nursing homes in 2008 were time barred, such that the issue of the Consulting Agreement was the only matter capable of being pursued in the Civil Action transferred to this Court by the District Court.

A hearing on Holber's Application to Retain Rhoades was held on April 3, 2013. At that time Attorney Levant reiterated his position, both on the existence of a release, and on his client's willingness to settle with the Trustee irrespective of the release. Attorney Tracey Updike from Cunningham & Chernicoff appeared for Segal and reiterated Segal's position that the claims made in the District Court did not constitute an asset of the Bankruptcy Estate.

Also present at the April 3rd hearing was Attorney Fox, now apparently a sole practitioner. Attorneys Updike and Fox argued that, if there was going to be a retention of anyone, it should be Fox, 1) because he knew the case from having represented Segal in connection with it for so many years, 2) because Segal and Rhoades would need to cooperate in prosecuting the Civil Action, but they did not like each another, and 3) because Fox had agreed to a 40% contingency fee, whereas Rhoades wanted 50%.

The Court concluded that, inasmuch as Segal's argument was that any monies owed under the Consulting Agreement were wages not available to the Estate, the retention of Fox to represent Holber was out of the question. On the other hand, no one contradicted the Court's "working assumption" that there was no one other than Rhoades eager to take on this representation in an otherwise no-asset case. (N.T. 4/3/2013, at 19) Rhoades' retention was therefore approved. In doing so, however, the Court specifically noted the Objectors' argument that there was a potentially dispositive

legal issue over whether any monies owed under the Consulting Agreement were or were not wages. The Court advised the parties that it seemed to make sense to address that threshold issue early on. Attorney Case assured the Court that they would be "cognizant of that" and "take a look at it." (*Id.* at 20-21)

Segal appealed the retention of Rhoades to the District Court. While the Appeal was pending Rhoades filed the instant adversary proceeding. (Docket # 172, November 6, 2013) On January 23, 2014 the present Dismissal Motions were filed. As noted above an omnibus response in opposition to the Motions was filed and a hearing was held on March 19, 2014. On March 20, 2014 the District Court concluded that Segal's appeal of Rhoades' retention was interlocutory and dismissed it for lack of jurisdiction.


*Discussion*

At the outset it is important to recall that the limited reason this bankruptcy case was reopened was to address the mandate contained in the District Court's Order of October 4, 2012, which was to determine if the subject of the Contract at issue before the District Court, (i.e., the Consulting Agreement) had been properly reported to the Bankruptcy Court and considered by the Trustee during the pendency of the Plaintiff's Chapter 7 petition. The Court answers this ultimate question first; answers it in the affirmative; and will so advise the District Court via a copy of this Opinion.

The evidence in support of this conclusion is extensive. Initially, the Consulting Agreement was scheduled as an asset, albeit with unknown value and questionable collectability. However, the Trustee's special counsel on more than one occasion has conceded that he personally reviewed the legitimacy of the Consulting Agreement with

16

the Trustee. In particular, when Segal moved to transfer the Civil Action back to the

District Court soon after it arrived here, Segal asserted inter alia the following:

> ¶ 7. At the First Meeting of Creditors, the Trustee questioned the Debtor concerning the Consulting Agreement. The Chapter 7 Trustee was aware of the Debtor's claim for monies owed under the Consulting Agreement. See paragraph 10 of the Declaration of Robert E. Chernicoff, Esquire (the "Chernicoff Declaration").

In response, Rhoades on behalf of Reliant replied, as follows:

> ¶ 7. Denied. It is specifically denied that the Trustee questioned Debtor regarding the Consulting Agreement at the First Meeting of Creditors and strict proof of the same is demanded by Reliant. By way of further response, it is specifically denied that the Trustee knew that the Debtor believed that his claims under the Consulting Agreement had any value to Debtor – much less sufficient value to warrant filing two separate actions seeking to recover almost $2 million dollars in two separate courts three (3) days following the closing of his bankruptcy case. <u>By the way of further response, despite counsel for Reliant advising the Trustee of Reliant's belief as to the motivations for the transaction giving rise to the Consulting Agreement, including the sale of the Debtor's largest asset, a nursing home known as Ashton Hall, and despite making a detailed presentation to the Trustee of the potential claims and having multiple in-person and telephone discussions concerning the prosecution of those claims, the Trustee failed to take action to prosecute claims to recover the proceeds from those transactions</u>. By way of further response, after receipt of the Motion, counsel for Reliant contacted counsel for the Trustee on January 24, 2013, to determine the Trustee's position as to the Motion. The Trustee's counsel advised that the Trustee was no longer a party to the case and would not be filing a response to the Motion or attending the hearing related to the Motion on February 6, 2013.

(Emphasis added.)

The foregoing recital is compelling evidence of "what the Trustee knew and when he knew it." Further to the point, the Trustee had obviously considered the Consulting Agreement, inasmuch as he had objected to the Debtor's claim that it was exempt in its entirety. The May 3, 2011 Stipulation between the Segal and the Trustee reflects an understanding and analysis of the relevant issues surrounding the Consulting Agreement. Pursuant to the May 3, 2011 Stipulation, unless Segal prevails on his claims, including that any monies owed under the Consulting Agreement are post-petition wages, he will be entitled to at most $410 of any recovery from his lawsuit. If Segal prevails on the post-petition wages issue than the Bankruptcy Estate would have no claim to any part of the recovery.[3] The Trustee certainly has a stake in the outcome of Segal's lawsuit and now, having been reappointed, he should consider the Estate's interest on this point. Indeed that would appear to be precisely what the Stipulation contemplated. That said, however, the Court reiterates that it cannot plausibly be maintained that the Trustee had been in the dark about the particulars of the Consulting Agreement during the pendency of the case.

---

[3]  Property of the estate consists of all legal or equitable interests of the debtor in property as of the commencement of case. 11 U.S.C. § 541(a)(1). Excepted from property of the estate "are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. ¶ 541(a)(6); *In re Toth*, 269 B.R. 587, 590 (Bkrtcy.E.D.Pa. 2001); *In re Campanella*, 207 B.R. 435, 439 (Bkrtcy.E.D.Pa.1997). Thus to the extent any monies owed under the Consulting Agreement constitute post-petition wages, they would not be part of the Bankruptcy Estate. Prepetition compensation, conversely, is property of the estate. *See In re Mack, 46 B.R. 652, 655* (Bkrtcy E.D.Pa. 1985) However, it can still pass out of the estate (and thus out of the reach of creditors) as a qualified exemption. See 11 U.S.C. § 522. Pennsylvania residents may choose either the exemptions provided under the federal bankruptcy scheme or may avail themselves of the state law exemptions. *See In re Allan*, 431 B.R. 580, 583 (Bkrtcy.M.D.Pa. 2010)(explaining that Pennsylvania has not opted out of the federal bankruptcy exemptions scheme).  Pennsylvania law exempts wages from attachment. See 42 P.S. ¶ 8127(a)(but excludes attachment proceedings related to divorce, support, or limited board). Thus, prepetition wages, while property of the bankruptcy estate, qualify for an exemption under Pennsylvania law. As noted, however, Segal claimed the exemptions available to him under Federal not State law. This factor could potentially have implications in Segal's Civil Action.

In reaching this conclusion the Court has taken into consideration the anomaly of
Friedman and Weinberger having initially signed onto the proposition that the Trustee
lacked adequate information to properly assess the value of the Consulting Agreement.
This argument was advanced on their behalf by Attorney Levant. The pair switched
lawyers when the instant adversary proceeding was filed and are represented now,
along with all of the other Capital Family Defedants, by the firm Flaster/Greenberg, P.C.

In their Motion to Dismiss this adversary proceeding the Capital Family
Defendants now argue that the Trustee should be judicially estopped from arguing that
he lacked sufficient information about the Consulting Agreement, based inter alia on the
matters of record referred to by the Court above. (See N.T. 3/19/2014, at 9) In a
roundabout way the Segal Family Defendants also adopt this argument.[4]

The Trustee, in response, argues that it is the Defendants who should be
judicially estopped from changing their position about "what the Trustee knew and when
he knew it." There is admittedly some appeal to the Trustee's argument on this point, as
it is rather clear that at least Friedman and Weinberger have done an about face on the
issue of the Trustee's knowledge with respect to the Consulting Agreement. However,

---

[4] The doctrine of judicial estoppel applies to prevent a miscarriage of justice when (1) the party to be
estopped has taken "two positions that are irreconcilably inconsistent"; (2) the party changed his or her
position "in bad faith – i.e. with intent to play fast and loose with the court"; and (3) "no lesser sanction
would adequately remedy the damage done by the litigant's misconduct." *Krystal Cadillac-Oldsmobile
GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003) (affirming the bankruptcy court's
dismissal of a complaint on the basis of judicial estoppel) (quoting *Montrose Medical Group Participating
Savings Plan v. Bulger*, 243 F.3d 773, 779-780 (3d Cir. 2001)). The doctrine recognizes "the intrinsic
ability of courts to dismiss an offending litigant's complaint without considering the merits of the
underlying claims when such dismissal is necessary to prevent a litigant from playing fast and loose with
the courts." *Krystal Cadillac-Oldsmobile GMC Truck*, 337 F.3d at 319. The doctrine of judicial estoppel is
applied in bankruptcy proceedings to prevent parties from taking inconsistent positions and to prevent
injustice. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-420 (3d Cir. 1988) (holding
that the debtor was judicially estopped because the debtor's "'silence' in the Oneida bankruptcy record
concerning this present claim, as they say in the vernacular, 'is deafening'"); *Amash v. Home Depot
U.S.A., Inc.*, 503 B.R. 232, 236 (N.D.N.Y.  2013) ("In the bankruptcy context, judicial estoppel is
commonly invoked in order to prevent a party who failed to disclose a claim in bankruptcy proceedings
from asserting that claim after emerging from bankruptcy.") (Internal quotations omitted).

estopping this argument as to Friedman and Weinberger, or as to all of the Defendants for that matter, will not suffice.

Attorney Levant argued that Friedman and Weinberger wanted to see the case kept here because they would rather deal with the Trustee and his counsel rather than Segal. Segal was present at that hearing on February 6, 2013 and behaved a bit intemperately in open Court. Perhaps Friedman and Weinbergers' misgivings over having to deal with Segal are well founded. This, of course, does not justify an improper change of position, but possibly it provides some context. In the final analysis, however, regardless of the position of Friedman and Weinberger, past or present, the evidence is very clear that sufficient information about the Consulting Agreement had been reported to the Court and the Trustee during the pendency of the bankruptcy case. Moreover, it appears to have appropriately dealt with by the Trustee under the circumstances. This is to say that, with no funds in the estate and no one willing to represent the Estate on a contingency basis, the Trustee lacked the means to initiate what this case has already shown would be complex, expensive and time consuming litigation. The Stipulation entered into between the Trustee and Segal appears to have struck the correct balance. If Segal prevails in his lawsuit, but cannot prove that any monies owed are post-petition wages, any funds recovered would presumably belong to the Estate. If Segal proves that there are monies owed, and that the monies at issue constitute post-petition wages, then the Estate is no worse off as a result.

The Court likewise acknowledges that the short 3 day interval between the date on which Segal's bankruptcy case was closed and the District Court Civil Action was commenced certainly gives one pause. Even under heightened scrutiny, however, the

same picture emerges. Rhoades argued that Segal had planned this precise tactic. (See Consulting Agreement at ¶ 11 *supra*) Rhoades predicted this exact course of conduct in his Motions seeking Rule 2004 Examinations. Paradoxically, the fact that events transpired just as Rhoades anticipated adds weight to the argument that the information was known to all during the pendency of Segal's bankruptcy case. Once again, by his own admission, Rhoades reviewed all of this extensively with the Trustee.

There seem to be more than enough grounds for judicial estoppel to go around in this case. That said, the key change to the landscape appears to be that Rhoades, having changed his professional affiliation, has also apparently changed his mind about representing the Trustee on a contingency basis. Regrettably, it would also appear that the Trustee and his attorneys disregarded the Court's encouragement to consider the viability of Segal's wage claim at the start. Instead, Rhoades has filed the instant 22 count adversary action which seeks to return to the time of the nursing home sales, and to unravel what Rhoades maintains was a wide ranging conspiracy among all of the Defendants incident to that transaction. In this respect Rhodes has exceeded what the Court envisioned his appointment to entail. The Appointment Order should have been clearer on this point. Irrespective, the Court finds that Rhoades' objective is futile, and the Complaint must be dismissed, inasmuch as the Court agrees with the Movants that the Trustee's many claims relative to the nursing homes sale are at this date all time barred.[5]

---

[5] Dismissal of an action is appropriate if a time-bar is apparent on the face of a complaint. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002)

The events on which the Trustee's Complaint are based occurred in 2008.

Bankruptcy Code § 108(a) provides the time limitations for a bankruptcy trustee to

initiate a lawsuit, as follows:

### § 108. Extension of time

**(a)** If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--

  **(1)** the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

  **(2)** two years after the order for relief.

11 U.S.C. § 108(a).

Thus, the Code permits the Trustee to commence an action, for which the

applicable statute of limitations had not expired before the date when the bankruptcy

case was filed, before the later of the time period provided under the applicable non-

bankruptcy law statute of limitations <u>or</u> two years after the Order for Relief commencing

the bankruptcy case.

As can be plainly seen, under either of the above alternatives the Trustee's

Complaint is out of time. As noted, Segal's case was commenced with the entry of an

Order for relief on August 3, 2010. If the operative limitation period is 2 years after the

Order for Relief, than the bar date for all but three of the counts in the Complaint was

August 3, 2012.[6] The Complaint was not filed until November 6, 2013, and it is thus, for

the most part, untimely on its face.

Alternatively, if the operative limitation period is the applicable non-bankruptcy

statutory period, then all of the counts are still stale given the date of the relevant events

---

[6]  Count XXII which seeks revocation of Segal's discharge is subject to a one year limitation period which expired on June 26, 2012. The Trustee's turnover Counts (III and IV) fail for reasons discussed infra.

(2008) and the applicable statutory periods which pertain to the various counts the

Trustee has asserted.

In this regard the counts in the Trustee's Complaint consist of the following:

### CLAIMS FOR RELIEF

| | |
|---|---|
| **COUNT I** | Violation of RICO, 18 U.S.C. §1962(c) |
| **COUNT II** | Conspiracy To Violate RICO, 18 U.S.C. § 1962(d) |
| **COUNT III** | Turnover Pursuant to 11 U.S.C. § 542(a) |
| **COUNT IV** | Turnover Pursuant to 11 U.S.C. § 542(a) |
| **COUNT V** | Fraudulent Transfer, 12 Pa. C.S.A. § 5104, 11 U.S.C. §548 |
| **COUNT VI** | Aiding and Abetting Fraudulent Transfer |
| **COUNT VII** | Fraud |
| **COUNT VIII** | Fraudulent Misrepresentation |
| **COUNT IX** | Negligent Misrepresentation |
| **COUNT X** | Conversion |
| **COUNT XI** | Civil Conspiracy |
| **COUNT XII** | Aiding and Abetting Civil Conspiracy |
| **COUNT XIII** | Aiding and Abetting Fraud |
| **COUNT XIV** | Aiding and Abetting Conversion |
| **COUNT XV** | Concert Of Action |
| **COUNT XVI** | Imposition of a Constructive Trust |
| **COUNT XVII** | Unjust Enrichment |
| **COUNT XVIII** | Breach of Contract |
| **COUNT XIX** | Breach of the Implied Covenant of Good Faith and Fair Dealing |
| **COUNT XX** | Action To Declare Eliezer Friedman, Naftali Weinberger,  Naomi Weinberger, Yehoshua Friedman, SF Family Credit Shelter Trust, 50 Jersey, LLC, Oakhurst Properties, LLC and Oakwood Healthcare, LLC Responsible For the Corporate Debts Of Capital Family Partners, LLC and Green Lion Group, LLC |
| **COUNT XXI** | Action to Declare Ardsley Group, Inc., Ashton Hall,  Inc. and Ashton Terrace, Inc. the Alter Egos of the Debtor |
| **COUNT XXII** | Revocation of the Debtor's Discharge Under Section 727(d)(2) of the Bankruptcy Code |

The applicable Bankruptcy and non-bankruptcy limitations periods for the above

counts are, as follows:

| COUNT I | Violation of RICO, 18 U.S.C. §1962(c) | 4 years[7] |
| COUNT II | Conspiracy To Violate RICO, 18 U.S.C. § 1962(d) | 4 years |
| COUNT III | Turnover Pursuant to 11 U.S.C. § 542(a) | Timely, but otherwise fails as discussed below |
| COUNT IV | Turnover Pursuant to 11 U.S.C. § 542(a) | Timely, but otherwise fails as discussed below |
| COUNT V | Fraudulent Transfer, 12 Pa. C.S.A. § 5104, 11 U.S.C. §548 | 2 years, 11 U.S.C. § 546(a); 4 years, state analog – 12 Pa. C.S. § 5109 |
| COUNT VI | Aiding and Abetting Fraudulent Transfer | 2 years, 42 P.S. § 5524(7) |
| COUNT VII | Fraud | 2 years, 42 P.S. § 5524(7) |
| COUNT VIII | Fraudulent Misrepresentation | 2 years, 42 P.S. § 5524(7) |
| COUNT IX | Negligent Misrepresentation | 2 years, 42 P.S. § 5524(7) |
| COUNT X | Conversion | 2 years, 42 P.S. § 5524(3) |
| COUNT XI | Civil Conspiracy | 2 years, 42 P.S. § 5524(7) |
| COUNT XII | Aiding and Abetting Civil Conspiracy | 2 years, 42 P.S. § 5524(7) |
| COUNT XIII | Aiding and Abetting Fraud | 2 years, 42 P.S. § 5524(7) |
| COUNT XIV | Aiding and Abetting Conversion | 2 years, 42 P.S. § 5524(3) |
| COUNT XV | Concert of Actions | 2 years, 42 P.S. § 5524(7) |
| COUNT XVI | Imposition of a Constructive Trust | 2 years, 42 P.S. § 5524(7) |
| COUNT XVII | Unjust Enrichment | 4 years, 42 P.S. § 5525(4) |
| COUNT XVIII | Breach of Contract | 4 years, 42 P.S. § 5525(8) |
| COUNT XIX | Breach of the Implied Covenant of Good Faith and Fair Dealing | 4 years, 42 P.S. § 5525(4) |
| COUNT XX | Action To Declare Eliezer Friedman, Naftali Weinberger, Naomi Weinberger, Yehoshua Friedman, SF Family Credit Shelter Trust, 50 Jersey, LLC, Oakhurst Properties, LLC and Oakwood Healthcare, LLC Responsible For the Corporate Debts Of Capital Family Partners, LLC and Green Lion Group, LLC | 2 years, 42 P.S. § 5524(7) |
| COUNT XXI | Action to Declare Ardsley Group, Inc., Ashton Hall, Inc. and Ashton Terrace, Inc. the Alter Egos of the Debtor. | 2 years, 42 P.S. § 5524(7) |
| COUNT XXII | Revocation of the Debtor's Discharge Under Section 727(d)(2) of the Bankruptcy Code | 1 year after discharge or date on which bankruptcy case is closed. 11 U.S.C. § 727(e)(2) |

In sum, on the face of the Complaint itself, and using any date during the year 2008 as the relevant time frame, all of the counts, insofar as they are subject to non-bankruptcy statutes of limitations, are out of time.

---

[7]      The RICO statute itself does not contain a limitations period, however, the Supreme Court has adopted a 4 year period. *Agency Holding Corp. v. Malley-Duff & Associates,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767 97 L.Ed.2d 121 (1987). The 4 year period is itself subject to an "injury discovery" Rule. *Forbes v. Eagleson,* 228 F.3d 471, 485 (3d Cir. 2000).The injury discovery rule has a subjective and objective component. Under the subjective test a claim accrues no later than when the Plaintiff itself discovered its injury. Under the objective test a claim accrues no later than when a Plaintiff is put on "inquiry notice of its injury." *Matthews v. Kidder Peabody & Co., Inc.* 260 F.3d 239, 250-251 (3d Cir. 2001).

In reaching this conclusion, the Court has given the Trustee the benefit of the doubt as to whether certain of the Counts in his Complaint are even viable as independent causes of action. This would apply to Count XIII – Aiding and Abetting Fraud, which is duplicative of a claim for concert of action; Count XVI – Constructive Trust, which is an equitable remedy rather than an independent cause of action; Count XIX – Breach of Covenant of Good Faith and Fair Dealing, which is at best superfluous where a breach of contract claim is pled; and Count XX – personal liability for corporate debts, which is also a remedy rather than independent cause of action.

In the same vein, the Court has assumed, arguendo, that the Trustee can maintain turnover actions under 11 U.S.C. § 542(a), given that to prevail the Trustee's right to turnover must be uncontested, whereas here there is clearly a bona-fide dispute as to the Trustee's entitlement to the relief being sought. *See In re Asousa Partnership,* 264 B.R. 376, 384-385 (Bkrtcy.E.D.Pa. 2001)

Most significantly, however, in reaching its conclusion the Court has considered but rejects the Trustee's arguments that, for purposes of a timeliness bar to his complaint, the Court should consider the various limitation periods to have been tolled so as to overcome any lateness. This really is the crux of the Trustee's position as to the entirety of his complaint. In this regard the Trustee makes reference to what he describes as two "complimentary" tolling doctrines. He describes them in this way:

> In the Complaint, the Trustee alleges sufficient facts to satisfy two complimentary tolling doctrines. First, the Trustee did not discover the injuries to the Debtor's estate until November 7, 2012, when Judge Jones' Order first appeared on the Bankruptcy Court's docket. Only then did the Trustee have knowledge of the Debtor's deception and learn that the Debtor

had been double-crossed by the Capital Family Defendants. It was then that any applicable statute of limitations began to run.

Second, the Defendants' fraudulent conduct equitably tolls any statute of limitations and estops the Defendants from raising a statute of limitations defense. *Id.* at 1388-90 (citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-52 (7th Cir. 1990) ). Quite simply, the Defendants' fraudulent actions equitably toll any statute of limitations applicable to the Trustee's claims. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997).

(Trustee's Omnibus Response to Dismissal Motions at PPS. 22-23)

The Trustee accurately recites the law, but misapplies it to the facts. The District Court Civil Action deals with the Consulting Agreement alone. As hereinbefore discussed, the Trustee's rights with respect to the Consulting Agreement are by design preserved. The effort to connect the Consulting Agreement dispute with the Trustee's wide-ranging conspiracy theory appears to be a not so subtle attempt to circumvent the statutory periods which allow the former but bar the latter.

The November 7, 2012 docketing of the District Court's Order which transferred Segal's Civil Action to the Bankruptcy Court is a proverbial "red herring." It in no way supports the argument that until that point the Trustee had no knowledge of the matters raised in his complaint. The November 7, 2012 docket entry has marginal relevance at best, given the history of this case as detailed *supra*. In this regard, the Court stresses, once again, that the Trustee was timely acquainted with the entire alleged conspiracy, from multiple sources, including most importantly his own present special counsel, attorney Rhoades.

As an alternative to November 7, 2012, the Trustee argues that the various statutes of limitations should be considered to have been "equitably tolled," due to the

Defendants' fraudulent conduct. This argument also lacks merit. Indeed, the authority

on which the Trustee relies is unhelpful to him.

> . . . to the extent this Court believes that the estate's causes of
> action accrued earlier, equitable principles should toll the
> beginning of any applicable statute of limitations until
> November 7, 2012. The Third Circuit has identified three
> instructive, but not exclusive scenarios in which equitable
> tolling may apply:
>
> > (1) where the defendant has actively misled the
> > plaintiff respecting the plaintiff's cause of action;
> > (2) where the plaintiff in some extraordinary way
> > has been prevented from asserting his or her
> > rights; or (3) where the plaintiff has timely
> > asserted his or her rights mistakenly in the wrong
> > forum.
>
> *Oshiver*, 38 F.3d at 1387.

(Trustee's Omnibus Response to Dismissal Motions at P. 24)

The District Court Civil Action involves the Consulting Agreement. None of the

above 3 instructive scenarios apply. As discussed, the Trustee knew of the details of the

Consulting Agreement; he knew of the possible course of action Segal might pursue

after his discharge; he protected the Estate's interests in the event that scenario

obtained, and his rights in that regard are intact. The Court perceives no grounds for

equitable tolling on these facts. The conundrum, if there is one, lies once again in the

Trustee's attempt to conflate the 2012 Consulting Agreement litigation with his many

other causes of action having to do with the nursing homes sale. This is perhaps

understandable given the position in which the Trustee finds himself, which is that the

latter causes of action are by now stale. This plight, however, does not dictate disregard

of the otherwise applicable periods of limitation.

The Defendants may have conspired as the Trustee alleges. Indeed, for purposes of these dismissal motions, the Court views all well pled allegations in the light most favorable to the Plaintiff/Trustee, and therefore assumes the Defendants acted as he alleges. See *McTiernan v. City of York*, 577 F.3d 521,526 (3d Cir. 2009) There is no getting around the fact, however, that the claims in question were not concealed from the Trustee, let alone fraudulently concealed from him. The evidence, in fact, suggests just the opposite. The trustee had ample information and ample time in which to act before the various limitation periods expired. He was unable or unwilling to do so and cannot alter matters now via this belated adversary proceeding.[8]

For all of these reasons, the Trustee's Complaint will be dismissed in its entirety and the Civil Action will be returned to the District Court. This Bankruptcy case, however, will remain open for the time being so that the Trustee may consider the position he wishes to take, if any, here or in the District Court with respect to Segal's Consulting Agreement Claims.[9]

---

[8] In this regard, the Court notes too, and with some concern, a certain puzzling indifference to matters on the part of the Trustee. As discussed, he filed no papers in connection with Segal's Motion to Transfer the Civil Action back to the District Court soon after it arrived here. He took no part in the hearing on the matter held on February 6, 2013, and there has been no rebuttal to attorney Fox's representation that attorney Case informed him that the Trustee had no position on the issue and planned to take no action. From this the Court is left with an uncomfortable sense that the Trustee may be little more than a nominal party plaintiff and that, in reality, it is attorney Rhoades who is the driving force behind this adversary proceeding.

[9] There are numerous other grounds upon which the Defendants press for dismissal of the Trustee's Complaint. The statute of limitations issue, however, is dispositive, making it unnecessary for the Court to address other arguments.

An appropriate Order follows.


By the Court:


_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:  May 1, 2014